# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    v.                                                       **Case No. 13-CR-041**

**DEMETRIUS MOORE**
        **Defendant.**

## DECISION AND ORDER

The government charged defendant Demetrius Moore with bank robbery and use of a firearm during a crime of violence. Defendant filed a motion to suppress, arguing that the police unlawfully stopped him, searched his car, and arrested him. The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing, then issued a recommendation that the motion be denied. Defendant objects. On de novo review, see Fed. R. Crim. P. 59(b), I find that the police lacked reasonable suspicion for the stop and accordingly grant the motion. Because I find the stop unlawful, I need not address the balance of defendant's contentions about the encounter.

## I. FACTS

On January 26, 2013, at about 11:51 a.m., City of Brookfield police Sgt. Mark Tushaus received information from dispatch that a bank located on the corner of Hampton Avenue and 132nd Street in the neighboring Village of Butler had been robbed. (Evid. Hr'g Tr. at 6, 64.) The robbery "involved a male black suspect dressed in all black and a hoodie [who] displayed a black handgun." (Tr. at 8.) Tushaus and other officers responded, attempting to set up a perimeter around the area. (Tr. at 7-8.)

While en route, Tushaus received information that the robbery suspect crashed the getaway car at the intersection of 132nd Street and Glendale Avenue, then fled on foot. (Tr. at 10-11, 13-14.) He also learned that the suspect had possibly been wearing a black wig, and that the black handgun used in the robbery was a Glock. (Tr. at 12.) While driving around the area of the bank, Tushaus learned that officers were tracking footprints from the crash site, which showed that the suspect was running eastbound along some railroad tracks south of Glendale Avenue. (Tr. at 14-15.) Tushaus decided to shore up the southwestern part of the perimeter, so he proceeded south on 134th Street, into a quiet residential area. (Tr. at 16.)

Driving an unmarked squad but in full police uniform, Tushaus proceeded down 134th Street looking for any suspicious activity related to the robbery. (Tr. at 17-18.) He saw a Dodge Journey SUV traveling west on Clover Lane approaching the intersection with 134th Street. Clover Lane is very short, just over one block; it dead ends to the east, about one mile from the area where the robber crashed. Beyond the dead-end is a grassy area and a large business park. (Tr. at 23.)

The SUV stopped at the intersection,[1] and as he drove past Tushaus saw that it contained two black males in dark clothing. He testified:

> Right away my intuition was that that vehicle and those occupants did not fit in that residential neighborhood. I got a reaction from them, as subtle as it may have been, of surprise. I saw eyes get big. I saw what I thought was just non-normal, relaxed, body language. I saw rigidness and stiffness. As I was driving by, if people want to make a turn right or left they would already be looking to the right or left to see if there's anymore oncoming traffic. Those individuals almost like froze, and just -- their heads didn't move, but their eyes just watched as I drove past them slowly.

---

[1]Tushaus testified that this is an uncontrolled intersection, i.e., there is no stop sign on 134th Street or Clover Lane, so it was proper for the suspect vehicle to stop and allow him to pass. (Tr. at 47-48.)

2

(Tr. at 20-21.) Tushaus further described their body language as "[v]ery stiff and almost like they didn't dare want to move or flinch at all." (Tr. at 21.) Tushaus testified that he passed within about fifteen to twenty feet of the other vehicle (Tr. at 21), and that he was able to view the occupants for three to five seconds (Tr. at 49).[2]

After Tushaus passed Clover Lane, the SUV turned left, heading south on 134th Street behind Tushaus. (Tr. at 24.) Tushaus stopped at the stop sign on 134th Street and West Lisbon Road, then continued south; the SUV followed him through that intersection. (Tr. at 25.) Tushaus testified that he felt tactically unsafe, so he pulled over to the right and allowed the SUV to pass. (Tr. at 26.) He then pulled out and followed, radioing that he wanted back-up in conducting a high risk traffic stop, which is used on dangerous suspects. (Tr. at 27-28.)

As he was preparing to make the stop, Tushaus received information that the robbery suspect may have been picked up in a vehicle. (Tr. at 29, 63.) After back-up arrived, Tushaus pulled the SUV over. (Tr. at 30.) At no time prior to the stop did Tushaus observe the SUV violate any traffic laws. (Tr. at 48.) The stop occurred at 12:20 p.m., about ½-hour after the initial robbery call. (Tr. at 64-65.)

After the stop, the officers commanded the driver (later identified as defendant) and passenger to exit, handcuffed them, and placed them in separate squad cars. The officers then conducted a "protective sweep" of the SUV to make sure no one else was inside; they found no other people, but on opening the back hatch they observed a black hoodie and a pair

---

[2]Photographs taken after their arrests revealed that the occupants were wearing dark colored winter coats. (Govt.'s Ex. 14 & 15.) Tushaus testified that he could not see the suspects' muscles through their coats and clothing, nor could he determine whether they were sweating. (Tr. at 49.) They made no outward display of shock, nor any evasive movements. (Tr. at 50.)

3

of black Levi's tennis shoes the tread of which (it was later determined) partially matched the suspect's footprints. (Tr. at 31-33, 38-39.)

## II.  DISCUSSION

The police may conduct an investigative stop based on reasonable suspicion that the suspect has committed or is about to commit a crime. E.g., United States v. Uribe, 709 F.3d 646, 649-50 (7th Cir. 2013) (citing Terry v. Ohio, 392 U.S. 1, 21-22 (1968)).  An officer initiating a Terry stop must be able to point to "specific and articulable facts" suggestive of criminality; he may not rely on a hunch. Id. at 650 (citing Terry, 392 U.S. at 21).  Reasonable suspicion requires some "objective manifestation" that the person stopped is, or is about to be, engaged in criminal activity. United States v. Ienco, 182 F.3d 517, 523 (7th Cir. 1999).  The court evaluates reasonable suspicion based on the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect. United States v. Bullock, 632 F.3d 1004, 1012 (7th Cir. 2011). The standard is an objective one, so the officer's subjective motivations for the stop are not relevant to the reasonableness inquiry. Uribe, 709 F.3d at 650.  The government bears the burden of establishing reasonable suspicion by a preponderance of the evidence. Id.

In this case, the government relies on defendant's match to the description of the robber, his tense demeanor when Tushaus passed by, his proximity to the bank, and the information that the robber had entered a second vehicle. The magistrate judge found the evidence "thin" but nevertheless sufficient to establish reasonable suspicion. Reviewing the matter de novo, I cannot agree.

First, defendant met the description of the robber in only the most general sense – he was a black male in dark clothing.  The police could not, consistent with the Fourth

4

Amendment, stop every black male within their perimeter wearing a dark winter coat on a cold January day. See United States v. Brown, 448 F.3d 239, 248 (3d Cir. 2006) (holding that the police could not lawfully stop any black males in the vicinity of the crime based on general descriptions). Tushaus had virtually no specifics on the robber's appearance – no description of his build, age, facial features or hair, or any other characteristics. To the extent that Tushaus did know more than race and gender, defendant didn't match the profile – he wasn't wearing a black hoodie or a wig.

Second, the subtle nervousness and rigidity Tushaus attributed to defendant and his companion cannot form the basis for a stop. "Most people, when confronted by a police officer, are likely to act nervous, . . . thus making such behaviors of very little import to a reasonable suspicion determination." United States v. Williams, No. 12-3864, 2013 WL 5314594, at *7 (7th Cir. Sept. 24, 2013); see also United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005) ("Nervousness is a common and entirely natural reaction to police presence[.]"); United States v. Brown, 188 F.3d 860, 865 (7th Cir. 1999) ("Nervousness or refusal to make eye contact alone will not justify a Terry stop and pat-down[.]"). Here, the behavior Tushaus attributed to defendant and his companion falls far short of the "furtive" or "evasive" behavior the Seventh Circuit has sometimes found supportive of reasonable suspicion. Cf. United States v. Oglesby, 597 F.3d 891, 894-95 (7th Cir. 2010) (approving Terry stop and frisk where the suspect slowly retreated while looking from side to side, angled his body away from the officers, and repeatedly lowered his right hand toward his right pants pocket). Rather, Tushaus described "reaction in their eyes. Like raised eyebrows." (Tr. at 52.) Raising an eyebrow at a police officer should not lead to a high risk traffic stop. Tushaus also described "rigidness, stiffness" in the occupants' bodies (Tr. at 52), but it's hard to derive anything from that as Tushaus

5

admitted that he couldn't see their muscles through their winter coats, nor could he see their hands. Tushaus further alluded to his "training and experience" in concluding that "something wasn't right about this" (Tr. at 51), but he again identified nothing specific. He admitted that it wasn't unusual to see an SUV or an African-American male in this neighborhood. (Tr. at 51.)[3]

Finally, defendant's general proximity to the crime scene, in a vehicle, cannot support reasonable suspicion. See United States v. Baskin, 401 F.3d 788, 791 (7th Cir. 2005) (stating that "a defendant's mere presence in an area of expected criminal activity does not in and of itself justify an investigatory stop"). The stop occurred about ½ hour after the robbery and about one mile from the location where the suspect abandoned his car and fled on foot. Moreover, defendant's direction and location did not match what the police knew about the suspect. The suspect crashed his car at the intersection of 132nd Street and Glendale Avenue, and, according to his footprints, proceeded east along some railroad tracks south of Glendale Avenue. Defendant's vehicle, on the other hand, emerged from Clover Lane heading west, and Clover Lane dead-ends to the east. Thus, a vehicle that picked the robber up at the

---

[3]The magistrate judge found significant Tushaus's testimony that defendant froze and watched him drive by, rather than looking to the left or right to check for other oncoming traffic. (Tr. at 21.) But Tushaus observed defendant for just a few seconds, an insufficient period to conclude that defendant wasn't acting like a normal motorist at an intersection. Indeed, Tushaus admitted that it was proper for defendant to stop at the intersection as he did. I am also compelled to note the "heads I win, tales you lose" nature of these types of observations. Tushaus found it suspicious that defendant intently watched him, but officers often cite refusal to make eye contact as a factor raising suspicion. See, e.g., Brown, 188 F.3d at 865. Tushaus testified that he found it notable that defendant turned left (following him) because a right turn would have taken defendant back towards the location of the robbery (Tr. at 25); but on cross examination Tushaus admitted that if defendant had turned right he would have turned around, followed, and made a traffic stop – defendant "was going to be stopped no matter which way [he] drove[.]" (Tr. at 68.) And Tushaus testified that he found it suspicious that defendant drove normally, but he also admitted that if defendant had been driving erratically that would have added to his suspicion. (Tr. at 68.)

6

point suggested by the footprints could not be located where defendant was. Tushaus speculated that the robber could have reached the area on foot after doubling back through the business park, emerging from the tree line beyond the dead-end. (Tr. at 66.) But at the time of the stop Tushaus had no evidence that the suspect had doubled back, despite the fact that the area was swarming with police officers – some eighteen squad cars from multiple jurisdictions. Just prior to the stop, Tushaus learned that the suspect may have gotten into a vehicle, but he had no description of the second getaway car, nor was he able to identify anything specific about defendant's SUV that reasonably led him to believe it was the second conveyance.

The cases upon which the government and the magistrate judge primarily rely are inapposite. In United States v. Lenoir, 318 F.3d 725, 729 (7th Cir. 2003), the court stated that "police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch." In Lenoir, the officer responded to a dispatch of a man with a gun. On arrival at the scene, the officer saw a man walking down an alley 1/8 of a block away; the man appeared to be intoxicated and seemed to be carrying something under this coat. As he approached, the officer saw a shotgun and a rifle protruding from inside the man's coat. On observing the police, the man ran into a nearby home. Id. at 727. In this case, defendant was about one mile from the crime scene, rather than 1/8 of a block; Tushaus saw no firearms or other evidence linking defendant to the robbery; and defendant engaged in no evasive behavior.

In United States v. Broomfield, 417 F.3d 654, 656-57 (7th Cir. 2005), the court held that the officer's initial contact with the suspect-defendant was not a seizure at all, so no quantum

7

of suspicion was needed. In dicta, the court did say that the stop was supported by reasonable suspicion, but again on distinguishable facts. Like this case, the initial dispatch in Broomfield referred to a robbery committed by a black male in dark clothing (brandishing a silver pistol) who fled on foot; but unlike this case, the "stop" occurred about fifteen minutes after the dispatch, it was nighttime, and there were few pedestrians about, which led the officer to believe this might be the robber. Id. at 654-55. When the officer told the suspect to stop and take his hands out of his pockets, the officer noticed a silver gun sticking out of the pouch of the man's sweatshirt. Id. at 655. In the present case, the officer noticed no firearms or anything else connecting defendant to the robbery.

### III. CONCLUSION

Sgt. Tushaus forthrightly testified that he relied on his police intuition in making the stop. While his hunch may have been correct, the objective circumstances considered in their totality do not support a finding of reasonable suspicion.

**THEREFORE, IT IS ORDERED** that defendant's motion to suppress (R. 21) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 22nd day of October, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

8